## ARKANSAS WHOLESALE GROCERS' ASS'N et al. v. FEDERAL TRADE COMMISSION.

Circuit Court of Appeals, Eighth Circuit.
April 5, 1927.

No. 301.

1. Constitutional law ⚖=80(2)—Statute making fact findings of Federal Trade Commission, supported by testimony, conclusive, held constitutional (Federal Trade Commission Act, § 5 [Comp. St. § 8836e]).

Federal Trade Commission Act, § 5 (Comp. St. § 8836e), providing that finding of commission as to facts, if supported by testimony, is conclusive, is constitutional, since Congress has power to delegate to administrative body or head of department power of finding facts on which subsequent orders may be made and action predicated.

2. Constitutional law ⚖=318—Right of review to determine whether fact findings of Federal Trade Commission are based on substantial evidence held to satisfy due process requirement (Federal Trade Commission Act, § 5 [Comp. St. § 8836e]; Const. Amend. 14).

Right of review to determine whether fact findings of Federal Trade Commission are based on substantial evidence, or whether they are arbitrary, oppressive, and in excess of its powers, and whether the order made is responsive to and justified by such findings, satisfies constitutional requirement of due process, as against contention that Federal Trade Commission Act, § 5 (Comp. St. § 8836e), making fact findings of commission, supported by testimony, conclusive, is invalid.

3. Trade-marks and trade-names and unfair competition ⚖=80½—Discontinuance before filing of complaint, of practices forming basis of Federal Trade Commission's order to cease and desist does not affect commission's jurisdiction, nor propriety of order.

That practices forming basis of findings and order of Federal Trade Commission requiring voluntary association of wholesale grocers to desist from unfair practices in restraint of interstate trade had been discontinued prior to filing of complaint with commission would not affect jurisdiction of commission, nor propriety of order made by it, since commission is not

obliged to assume that such practices will not be resumed.

**4. Trade-marks and trade-names and unfair competition ⊙⇒80½—Error assigned to incompetency of testimony before Federal Trade Commission cannot be considered, if findings are supported by substantial competent testimony.**

If findings of Federal-Trade Commission on which its order requiring respondents to cease and desist from continuing unfair practices in restraint of interstate trade are supported by any substantial competent evidence, error assigned because of incompetency of testimony at hearings cannot be considered by court.

**5. Commerce ⊙⇒48—Restraint of interstate commerce produced by peaceful persuasion is unlawful.**

Restraint of interstate commerce produced by peaceful persuasion, unattended by coercion or intimidation, is unlawful.

**6. Trade-marks and trade-names and unfair competition ⊙⇒80½—Complaint charging that wholesale grocers' association, by threats, intimidation, and boycott, sought to prevent manufacturers selling directly to retail dealers, held sufficiently definite to support order to cease and desist (Federal Trade Commission Act [Comp. St. §§ 8836a–8836k]).**

Complaint charging that voluntary association of wholesale grocers, by persuasion, intimidation, boycott, and threats of boycott, coerced manufacturers and producers to refrain from selling goods directly to retail dealers, dealers carrying on combined retail and wholesale business, and co-operative purchasing enterprises of retailers, resulting in obstruction of interstate trade, within Federal Trade Commission Act (Comp. St. §§ 8836a–8836k), *held* sufficiently definite to support order to cease and desist from such practices.

**7. Trade-marks and trade-names and unfair competition ⊙⇒80½—Federal Trade Commission's order requiring wholesale grocers' association to desist from unfair practices obstructing interstate trade held not indefinite or uncertain.**

Order of Federal Trade Commission requiring voluntary association of wholesale grocers, its officers, members, agents, representatives, and employees, to cease and desist from following a common course of action pursuant to mutual understanding, combination, agreement, or conspiracy to directly or indirectly lessen competition in trade in groceries in interstate commerce, stating specific practices charged and established by proof and calculated to bring about unfair dealing in interstate trade, *held* not indefinite, uncertain, or illegal.

Petition for Review of Order of Federal Trade Commission.

Petition by the Arkansas Wholesale Grocers' Association and others against the Federal Trade Commission to review an order of the Commission requiring petitioners to cease and desist from certain methods of competition in interstate trade.    Order affirmed.

Edgar Watkins, of Atlanta, Ga. (Watkins, Asbill & Watkins, of Atlanta, Ga., on the brief), for petitioners.

Eugene W. Burr, of Washington, D. C. (Bayard T. Hainer and Adrien F. Busick, both of Washington, D. C., on the brief), for respondent.

Before STONE and VAN VALKENBURGH, Circuit Judges, and TRIEBER, District Judge.

VAN VALKENBURGH, Circuit Judge. On or about September 13, 1924, a proceeding was instituted before the Federal Trade Commission against the Arkansas Wholesale Grocers' Association, its officers and members. The complaint charged that the Wholesale Grocers' Association therein named as respondent is a voluntary unincorporated association of individuals, partnerships and corporations with their principal places of business in the state of Arkansas, and engaged in selling, at wholesale, groceries and allied products to retail dealers located at points in Arkansas and in neighboring states, said members being banded together with said association for the purpose of promoting and protecting their common interest; that the members of the association are many in number, and in the aggregate constitute about one-half the number of all the wholesale dealers in the state of Arkansas; that said members and corporations, named as respondent, purchase the products in which they deal directly and immediately from manufacturers and producers located for the most part in states other than the state of Arkansas, and said manufacturers and producers ship the goods so purchased from their respective places of business in such other states to the members and corporation respondents in the state of Arkansas; that upon reselling said products in the course of their aforesaid business the members and corporation respondents cause said products to be transported from their respective places of business in the state of Arkansas to their vendees at their respective points of location in the state of Arkansas and in neighboring states; that said members and corporation respondents are normally in competition with each other in price and otherwise, and with other individuals, partnerships, and corporations also engaged in the purchase of like products from manufacturers and producers as aforesaid, and in the resale thereof in the territory served by said respondent association; that the respondents in said proceedings designate the channel of

distribution commencing with the manufacturer or producer, flowing thence to the wholesaler, from the wholesaler to the retailer, and from the retailer to the consuming public, as the only regular and legitimate channel of distribution. Channels of distribution originating with the manufacturer or producer which do not flow through the wholesale dealer, but go direct to the consumer, or to a dealer doing both a wholesale and retail business, or direct to retail dealers, and especially to co-operative purchasing enterprises of retail dealers, are by said respondents designated as irregular and illegitimate channels of trade, and such dealers acquiring goods through so-called illegitimate channels are by respondents designated as irregular or illegitimate dealers. The complaint further charges that for more than three years, then last past, the respondents named therein have united in a common course of action and have co-operated and confederated together and with others to confine the distribution of groceries and allied products to the aforesaid so-called regular and legitimate channels of trade, to prevent so-called irregular and illegitimate dealers from obtaining groceries and allied products from manufacturers and producers thereof, and thereby to suppress competition and especially competition in price therein, in the territory which they serve.

In furtherance of this program it is charged that said respondents frequently hold general and special meetings for the interchange of information concerning and the discussion and adoption of plans and measures for the carrying out of their said undertaking; also by distributing and disseminating among respondents, the members of said respondent association, and others, bulletins published by respondent association containing names and lists of names of manufacturers and producers selling to so-called irregular dealers, and by correspondence and reports between the association and the members and between the members amongst themselves, all the members are informed of instances of the sale by manufacturers and producers of aforesaid products to so-called irregular dealers, and thereupon respondents bring pressure to bear upon such manufacturers and producers to cease dealing with such vendees, and by persuasion, intimidation, threats of boycott, and by boycott, attempt to and do coerce such manufacturers and producers to refrain from supplying such dealers with goods; that said respondents use other co-operative and individual means to carry out and make ef-

fective their aforesaid undertaking. It is further charged that said acts and things substantially lessen, hinder, and suppress competition in the sale and distribution of groceries and allied products in the territory served by respondents, obstruct the natural flow of commerce in the channels of interstate trade, and deny the dealers in and consumers of said commodities in the aforesaid territories advantages in price and otherwise which they would obtain from the natural flow of commerce in said commodities under conditions of free and unobstructed competition, all resulting in restraint of trade and to the prejudice of the public, of respondents' competitors and of manufacturers, producers, and dealers not complying with and adhering to the aforesaid plan and limitation of trade, and constituting unfair methods of competition in commerce within the meaning of the Federal Trade Commission Act (Comp. St. §§ 8836a–8836k).

The record is long and tends to support the charges made in the complaint. As alleged therein the secretary of the respondent association sent out frequent bulletins to the membership, strongly urging them to refrain from trading with manufacturers and producers who sold directly to retailers, brokers, or consumers. A few quotations from these bulletins will serve to illustrate their character and objective. That of January 9, 1922, contains the following:

"We hope that all wholesale grocers will look over their list of manufacturers from whom they buy and see the ones that are selling the chain stores at the same price that they are selling the wholesale grocers. When you buy from them, you give them the club that they are pounding you with and the club that they pound the retailers with."

One of December 27, 1921, reads:

"Resolved, that as far as possible, we will give our orders for merchandise to those manufacturers who sell to the wholesale trade exclusively."

And, again:

"Be loyal to those who are loyal to you. You can reduce to a minimum the articles carried for those manufacturers who are giving the 'double cross' to the wholesale grocers. You know who those manufacturers are. We don't have to make a list of them. Just go through your stock, make a list for your own information, then see if you can't cut those lines out that are featured by the manufacturer who is not dealing on the level with the wholesale grocers.

"Now is the time and now the opportunity to clean all such articles out of stock

and now is the time to favor the goods which 'pay their fare' and to favor those manufacturers who favor ·you. * * * The trade is united; it is on the defensive; courageous action is the need of the hour."

A certain trade journal, known as "Duncan's Trade Register," on the cover of its issue of November, 1921, announced its purpose to publish a list of "undesirables," and in the course of its notice said:

"What the retailer needs is a list of concerns placing chain stores on the jobbers' list. * * * Compel them to distribute through the chain stores."

The cover then gave as a sample of the list later to be published a number of prominent manufacturers and producers. The secretary of the respondent association, on November 3, 1921, issued a bulletin containing the following:

"The List of Undesirables.

"The above is the title of an article on the front page of Duncan's Trade Register, November, 1921. If you do not take this splendid magazine, it will pay you to subscribe. In his January edition he will give you a complete list of 'undesirables.' That is what he terms the manufacturers who are selling the chain stores at the prices they sell the wholesaler. In this article he gives a few of them. He says that the list given is just a sample, and that the complete list will be ready for distribution January 1st. The price is $3, including yearly subscription to Duncan's Trade Register. 'Don't you think the list worth the money, and then you get this fine magazine for a year? Address, Portland, Oregon.'"

In the February issue of Duncan's Trade Register, under the heading "List of Undesirables and Malefactors of Great Wealth" appeared a list of corporations, manufacturers, and producers concerning which that magazine gave the following advice:

"Boycott them? Why certainly. Trade Register makes no reservation in advising the boycott and ostracism. They are criminals without the law, a menace to commerce, society, and the peace of the world. Boycott them by all means, fair or foul. * * * Don't buy their goods, use their goods, or miss a chance to advise your friends to give like treatment."

In the bulletin of February 8, 1922, the secretary of the respondent association makes the following comment:

"Duncan's Trade Register for February. Have you received your copy? Well, ours has arrived. It is a real 'hot one.' Mr. Duncan is one of those fearless writers, who call an ace an ace and a spade a spade. His defense of the wholesale grocer in his article entitled 'Jobbers Must Stand Trial' is one of the best things that we have ever read, and if there was nothing else in this issue it should appeal to you to subscribe. But there are many other articles that merit your attention. Then the list of the concerns over this country who are not dealing as they should are in this issue."

The foregoing quotations from the bulletins of the Wholesale Grocers' Association will serve sufficiently to disclose the objects and methods of that association and its members. It appears in evidence that the suggestions thus broadly made resulted in withdrawals of patronage amounting to boycott, and affecting interstate trade in groceries and allied products in Arkansas and in neighboring states. The commission found the practice of the respondents to be as follows:

"The member respondents purchase the major part of the products in which they deal, both directly and through brokers, from manufacturers and producers of such products located in various states of the United States other than the state of Arkansas, and cause such purchased products to be transported from the various states, in which the same are manufactured or produced, to the several warehouses and places of business of the respondent members in the state of Arkansas. The goods so transported are sold and delivered by the respondent members from their respective places of business in the state of Arkansas to their dealer vendees at the respective points of location· of said vendees in the state of Arkansas, and at times to dealer vendees located in neighboring states, including·Missouri, Texas, and Oklahoma. In the course and conduct of their respective businesses respondent members are engaged in competition with each other, and with other wholesale grocer concerns, and with various manufacturers and producers for the trade of retail grocers within the territory above described served by said respondent members. Manufacturers, both those acting through brokers and those not so acting, ship groceries and allied products to customers in Arkansas, including respondent members and other wholesale grocers and chain stores, and are in competition among themselves for this trade. * * *

"The acts and things aforesaid, done by respondent association and respondent ·officers and members pursuant to. the said mutual understanding, tend to close certain out-

lets in the state of Arkansas for the sale, by manufacturers and producers in other states, of goods shipped by them into said state, to regulate commerce by eliminating 'irregular' dealers and their suppliers from it, and by restricting it to such producers and dealers as abide by the plan of trade described above, and to lessen competition in the sale of groceries and allied products in the territory served by respondents and thus to deny dealers and consumers advantages in price and otherwise which they would obtain from the natural flow of commerce under conditions of free competition. Such common course of action, combination, and conspiracy was adopted and pursued for the purpose and with the effect of substantially lessening, hindering, burdening, and regulating the course of interstate commerce in groceries and allied products between other states and the state of Arkansas."

It held such practices to be to the injury and prejudice of the public, competitors, manufacturers, producers, and their representatives, and to constitute unfair methods of competition in interstate commerce. It made a cease and desist order in accordance with these findings. To review that order of the commission this original petition is brought before us.

[1] Section 5 of the Federal Trade Commission Act (Comp. St. § 8836e) contains this provision: "The findings of the commission as to facts, if supported by testimony, shall be conclusive." Petitioners submit that this provision, and therefore the statute, is unconstitutional. It is conceded that the Federal Trade Commission Act has frequently been enforced in the courts, and that the provision attacked has often been quoted, applied, and approved. It is insisted, however, that this issue has not heretofore been definitely raised, and that courts do not voluntarily hold a statute unconstitutional in the absence of such an issue. It may be true that the constitutionality of the act, instead of being directly decided, has rather been necessarily assumed, in the many cases in which that act, and this specific provision, have been considered by the Supreme Court. Nevertheless we think the question cannot now be regarded an open one. The Federal Trade Commission is an administrative body; it is a fact-finding body. It has been authoritatively held that it is within the power of Congress to delegate to an administrative body, or head of a department, the duty and power of finding facts upon which subsequent orders may be made and action predicated. Such power has been delegated,

and its exercise upheld, in the case of the Interior Department, the Department of Agriculture, the Post Office Department, the Interstate Commerce Commission, the Commissioner of Immigration, and the Federal Trade Commission; the orders made enjoin a course of conduct; in some cases they indirectly, at least, affect substantial property rights.

In I. C. C. v. Union Pacific R. Co., 222 U. S. 541, 32 S. Ct. 108, 56 L. Ed. 308, after declaring that the statute made the findings of the Interstate Commerce Commission as to reasonableness of rates prima facie correct, the court said:

"In determining these mixed questions of law and fact, the court confines itself to the ultimate question as to whether the commission acted within its power. It will not consider the expediency or wisdom of the order, or whether, on like testimony, it would have made a similar ruling. 'The findings of the commission are made by law prima facie true, and this court has ascribed to them the strength due to the judgments of a tribunal appointed by law and informed by experience.' Ill. Cent. v. I. C. C., 206 U. S. 441 [27 S. Ct. 700, 51 L. Ed. 1128]. Its conclusion, of course, is subject to review, but when supported by evidence is accepted as final; not that its decision, involving as it does so many and such vast public interests, can be supported by a mere scintilla of proof—but the courts will not examine the facts further than to determine whether there was substantial evidence to sustain the order." Id., pages 547, 548 (32 S. Ct. 111).

In U. S. v. L. & N. R. R., 235 U. S. 314, 35 S. Ct. 113, 59 L. Ed. 245, the court below substituted its judgment as to the existence of a preference for that of the commission, on the ground that where there was no dispute as to the facts it had a right to do so. In rejecting this view the Supreme Court, speaking through Mr. Justice White, said:

"It is not disputable that from the beginning the very purpose for which the commission was created was to bring into existence a body which from its peculiar character would be most fitted to primarily decide whether from facts, disputed or undisputed, in a given case preference or discrimination existed. East Tenn., etc., Ry. Co. v. Interstate Com. Com., 181 U. S. 1, 23, 29 (21 S. Ct. 516, 45 L. Ed. 719]. And the amendments by which it came to pass that the findings of the commission were made not merely prima facie, but conclu-

sively, correct in case of judicial review, except to the extent pointed out in the Illinois Central and other cases, supra, show the progressive evolution of the legislative purpose and the inevitable conflict which exists between giving that purpose effect and upholding the view of the statute taken by the court below. It cannot be otherwise since, if the view of the statute upheld below be sustained, the commission would become but a mere instrument for the purpose of taking testimony to be submitted to the courts for their ultimate action." Id., pages 320, 321 (35 S. Ct. 114).

The general power of Congress to clothe an administrative body with such authority is thus expressed by the Supreme Court in Union Bridge Co. v. U. S., 204 U. S. 364, 27 S. Ct. 367, 51 L. Ed. 523:

"Indeed, it is not too much to say that a denial to Congress of the right, under the Constitution, to delegate the power to determine some fact or the state of things upon which the enforcement of its enactment depends would be 'to stop the wheels of government' and bring about confusion, if not paralysis, in the conduct of the public business." Id., page 387 (27 S. Ct. 374).

If such be the holdings in cases where the findings are made but prima facie true, how much greater their pertinancy where such findings are by statute made conclusive. But decisions respecting the Federal Trade Commission Act itself are abundant and equally conclusive. In Federal Trade Commission v. Curtis Publishing Co., 260 U. S. 568, 43 S. Ct. 210, 67 L. Ed. 408, Mr. Justice McReynolds said:

"Manifestly, the court must inquire whether the commission's findings of fact are supported by evidence. If so supported, they are conclusive." And in a concurring opinion in the same case Mr. Chief Justice Taft uses this significant language: "I think it of high importance that we should scrupulously comply with the evident intention of Congress that the Federal Commission be made a fact-finding body, and that the court in its rulings preserve the board's character as such and not interject its views of the facts where there is any conflict in the evidence."

To the same effect are U. S. v. L. & N. R. R. Co., 235 U. S. 314, 35 S. Ct. 113, 59 L. Ed. 245; Federal Trade Com. v. Winsted Hosiery Co., 258 U. S. 483, 42 S. Ct. 384, 66 L. Ed. 729; Chamber of Commerce v. Fed. Trade Com. (C. C. A. 8) 280 F. 45, 48; Cream of Wheat Co. v. Fed. Trade Com. (C. C. A. 8) 14 F.(2d) 40; National Harness Mfg. Ass'n v. Federal Trade Com. (C. C. A. 6) 261 F. 170, 171; Federal Trade Com. v. Gratz (C. C. A. 2) 258 F. 314, 11 A. L. R. 793; Beech Nut Packing Co. v. Federal Trade Com. (C. C. A. 2) 264 F. 885, 890; Western Sugar Refinery Co. v. Federal Trade Com. (C. C. A. 9) 275 F. 725, 733; Grocers' Ass'n of El Paso v. Federal Trade Com. (C. C. A. 5) 277 F. 657, 663; American Tobacco Co. v. Federal Trade Com. (C. C. A. 2) 9 F.(2d) 570, 575; also Harriet Hubbard Ayer, Inc., v. Federal Trade Com. (C. C. A. 2) 15 F.(2d) 274; Federal Trade Com. v. Pacific States Paper Trade Ass'n, 47 S. Ct. 255, 71 L. Ed. ——; Virginian Ry. Co. v. United States, 47 S. Ct. 222, 71 L. Ed. ——.

[2] The right of review to determine whether the findings of the commission are based upon substantial evidence or whether they are arbitrary, oppressive, and therefore in excess of its powers, and whether the order made is responsive to and justified by such findings, satisfies the requirement of due process. There is no ground in a case of this nature to say that the petitioners did not have, or were denied, a full and sufficient hearing. San Diego Land Co. v. National City, 174 U. S. 739, 19 S. Ct. 804, 43 L. Ed. 1154.

[3] It is urged that many or all of the practices which formed the basis of the findings and order of the commission had taken place and had been discontinued some time prior to the filing of the complaint. This, if true, would not affect the jurisdiction of the commission nor the propriety of the order made, since the commission is not obliged to assume that such practices will not be resumed. Guarantee Veterinary Co. v. Federal Trade Com. (C. C. A. 2) 285 F. 853; Chamber of Commerce of Minneapolis v. Federal Trade Com. (C. C. A. 8) 13 F. (2d) 673, 686.

[4] Error is assigned because of alleged incompetent testimony at the hearings. This assignment cannot be entertained provided there is any substantial competent testimony to support the findings. Hills Bros. v. Federal Trade Commission (C. C. A. 9) 9 F. (2d) 481, 484. "Findings and order of the commission may not be rejected as evidence because of any errors in its procedure not amounting to a denial of the right to a fair hearing, so long as the essential facts found are based upon substantial evidence. * * * The commission is not to be regarded as having acted arbitrarily, nor may its findings and order be rejected as wanting in support, simply because the hearsay evi-

dence was considered with the rest." Spiller v. Atchison, T. & S. F. Ry. Co., 253 U. S. 117, 126, 131, 40 S. Ct. 466, 64 L. Ed. 810; Interstate Commerce Commission v. Baird, 194 U. S. 25, 44, 24 S. Ct. 563, 48 L. Ed. 860.

[5] It is next insisted that the facts in evidence do not sustain the finding; that petitioners at most resorted merely to persuasion and that this they had a right to do provided that persuasion was peaceful and unattended by coercion or intimidation. The controlling decisions are to the contrary as applied to the facts in this case. Eastern States Lumber Ass'n v. United States, 234 U. S. 600, 34 S. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788; Lawlor v. Loewe, 235 U. S. 522, 534, 35 S. Ct. 170, 59 L. Ed. 341. Referring to the cases last cited, the Supreme Court, in Duplex Co. v. Deering, 254 U. S. 443, 467, 468, 41 S. Ct. 172, 177 (65 L. Ed. 349, 16 A. L. R. 196), said:

"It is settled by these decisions that such a restraint produced by peaceable persuasion is as much within the prohibition as one accomplished by force or threats of force; and it is not to be justified by the fact that the participants in the combination or conspiracy may have some object beneficial to themselves or their associates which possibly they might have been at liberty to pursue in the absence of the statute."

[6, 7] Our conclusion is that the complaint filed was sufficiently definite, that the proofs sustained the charges made, and that the findings of the commission were supported by substantial competent evidence. Finally, it is complained that the order to cease and desist is indefinite, uncertain and illegal both in general and in each particular paragraph thereof. That order is:

"That the respondent association, its officers, both individually and in their said official capacity, and its individual members, their agents, representatives and employees or any group of such respondents or their agents, either with or without the co-operation of persons not parties hereto, cease and desist from following a common course of action pursuant to mutual understanding, combination, agreement or conspiracy, for the purpose or with the effect, directly or indirectly, of lessening competition in the course of trade in groceries or allied products, or any of them, entering the state of Arkansas from other states, by the following methods, or any one or more thereof, to wit."

Then follow in separate paragraphs the specific practices charged in the complaint, established by the proof, and naturally calculated to bring about the unfair dealing in interstate trade, which was the subject of investigation by the commission. These various paragraphs are responsive to and justified by the findings made. In no respect does the order invade the right to exercise individual preferences in trade relations; that is, of buying from whom one pleases and selling to whom one elects, if unaccompanied by unlawful combination and agreement. It is therefore approved and confirmed.

TRIEBER, District Judge. I concur in the opinion of Judge VAN VALKENBURGH, but wish to add that on the question of the constitutionality of the provision of the Federal Trade Commission Act, making the findings of the commission, if supported by testimony, conclusive, the authorities cited by counsel for petitioners to sustain this contention are not in point.

In Cairo & Fulton Railroad Co. v. Parks, 32 Ark. 131, the act made a tax deed executed by the county clerk conclusive that each and every act and thing required to be done had been performed. Under that statute there was no hearing or opportunity to be heard and the clerk is merely a ministerial officer, possessing no quasi-judicial powers.

In Little Rock & F. S. Railroad Co. v. Payne, 33 Ark. 816, 34 Am. Rep. 55, the statute did not provide that the killing of stock by trains shall be conclusive evidence of negligence, but the trial court so construed it. This was held to be erroneous.

In Chicago, etc., Railway v. Minnesota, 134 U. S. 418, 10 S. Ct. 462, 33 L. Ed. 970, the statute made the rates or charges for transportation recommended by the railway and warehouse commission of the state conclusive. There was no opportunity afforded to have a judicial inquiry as to the reasonableness of the rate established, or whether confiscatory. This was held unconstitutional.

In United States v. Colgate, 250 U. S. 300, 39 S. Ct. 465, 63 L. Ed. 992, 7 A. L. R. 443, the sufficiency of an indictment was involved, and it was held that as the indictment failed to charge the defendant with acting in co-operation with other manufacturers of like articles, and that one carrying on a private business has the right to determine to whom to sell or refuse to sell. This also applies to some of the other authorities relied on.